# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
)
RGOI ASC, LTD. d/b/a RIO GRANDE      )
ORTHOPAEDIC INSTITUTE      )
AMBULATORY SURGERY      )
CENTER and MONROE COUNTY      )
HEALTH CARE AUTHORITY      )
d/b/a MONROE COUNTY HOSPITAL      )     Case No. 1:18-cv-12624-RGS
     )
     Plaintiffs, Individually      )     COMPLAINT -
     and as Members of a      )     CLASS ACTION
     Class      )
     )     Sherman Act § 2
     )     15 U.S.C. § 2
     )
     )     Clayton Act §§ 4(a), 16
v.      )     15 U.S.C. §§ 15(a), 26
     )
     )
GENERAL ELECTRIC COMPANY,      )     JURY TRIAL DEMANDED
GE HEALTHCARE INC., a subsidiary of      )
GENERAL ELECTRIC COMPANY;      )
and DATEX-OHMEDA, INC., a subsidiary of      )
GENERAL ELECTRIC COMPANY.      )
     )
     Defendants.      )
_____ )

## Table of Contents

NATURE OF ACTION ...................................................................................................1

PARTIES .....................................................................................................................3

JURISDICTION AND VENUE ....................................................................................4

TRADE AND COMMERCE AFFECTED ...................................................................4

RELEVANT MARKETS .............................................................................................4

Relevant Product Market for the Sale of Parts for GE Gas Anesthesia Machines .........................4

Relevant Product Market for the Sale of Service Training for GE Gas Anesthesia
Machines .................................................................................................................5

Relevant Product Market for Sale of Service for GE Gas Anesthesia Machines .........................6

Relevant Geographic Markets .....................................................................................7

MONOPOLY POWER ................................................................................................8

Relevant Market for the Sale of Service for GE Gas Anesthesia Machines ..................................8

Relevant Product Market for the Sale of Parts for GE Gas Anesthesia Machines .........................9

Relevant Product Market for the Sale of Service Training for GE Gas Anesthesia Machines ..... 10

Relevant Market for GE Service ................................................................................10

GE EXCLUSIONARY CONDUCT TO MAINTAIN A SERVICE MONOPOLY ..............12

Collateral Estoppel ...................................................................................................12

Long-Term GE Exclusionary Conduct Contributing to Antitrust Price Injury in the
Damage Period Is Actionable ....................................................................................12

GE's Exclusionary Conduct Is Evaluated in Its Entirety Rather Than Piecemeal .......................13

GE's Use of Its Parts Monopoly to Monopolize Service .........................................................13

For a Decade and One-Half GE Profitably Sold Parts Directly to Its ISO Service
Competitors Allowing National ISO Service Competition ......................................................14

Beginning in 2011 GE Ended Its Direct Parts Sales with the Effect of Eliminating
Reliable ISO Parts Access and Substantially Suppressing Its
Service Competition ...................................................................................................14

GE's Use of Its Service-Training Monopoly to Monopolize Service ..........................16

For Years GE Profitably Sold Service Training to Its ISO Competitors.....................16

Denial of ISO Training on Both Older and Newer Machines ....................................16

GE Conditions Make ISO Training Economically Infeasible ....................................17

**INJURY TO COMPETITION**.................................................................................18

**CLASS ACTION ALLEGATIONS**..........................................................................19

Class of Direct Purchasers of GE Service ................................................................19

Federal Rule of Civil Procedure 23(a) Prerequisites ................................................19

Federal Rule of Civil Procedure 23(b)(3) Prerequisites ...........................................20

Federal Rule of Civil Procedure 23(b)(2) Prerequisites ...........................................20

**COUNT I**

Monopolization – (Section 2 of the Sherman Act)...................................................21

**PRAYER FOR RELIEF**.........................................................................................21

**JURY DEMAND**....................................................................................................22

## NATURE OF ACTION

1.      Plaintiffs RGOI ASC, LTD. d/b/a Rio Grande Orthopedic Institute Ambulatory Surgery Center and Monroe County Health Care Authority d/b/a Monroe County Hospital individually and as proposed representatives of direct purchasers of service for GE gas anesthesia machines will show the Court as follows.

2.      Defendants General Electric Company, GE Healthcare, and Datex-Ohmeda d/b/a GE Medical Systems (hereinafter collectively referred to as "GE") sell service for complex and durable GE gas anesthesia machines primarily to hospitals, clinics, physician groups, and asset management companies (collectively referred to herein as "purchasers" or "hospitals") GE possesses monopoly power in the markets for parts and service training for GE gas anesthesia machines and uses its monopoly power in the parts and service-training markets to maintain its monopoly in the market for servicing GE gas anesthesia machines, allowing GE to charge supra competitive prices for its servicing of these machines.

3.      The GE equipment is unique and the GE parts and GE service training are not compatible with, or reasonably interchangeable with, parts and training associated with anesthesia gas machines manufactured by others.

4.      In providing service for these complex GE machines, GE competes with third party service vendors ("independent service organizations" or "ISOs") in a national relevant market for the sale of such service. To perform service on the GE machines GE technicians and ISOs need reliable, rapid, and cost-effective access to GE parts and GE service training.

5.      In the past those ISOs able to gain access to parts and service training have nearly always priced their service substantially below that of GE for comparable service quality.

1

6.     For nearly a decade and one-half GE profitably sold GE parts directly to ISOs, as well as GE service training. In 2011, however, GE changed its parts policies under which it profitably sold parts to ISOs to leverage unlawfully its monopoly control over these parts to disadvantage severely ISOs as they seek to provide rapid, cost-effective and efficient service at competitive prices for critical and complex GE gas anesthesia machines.

7.     Thereafter in 2014 GE also changed its policies under which it profitably sold service training to ISOs to leverage unlawfully its monopoly control over this training also to disadvantage severely ISOs seeking to provide rapid, cost-effective and efficient service for this critical and complex medical equipment.

8.     With these exclusionary parts and service training policies GE has monopolized the relevant market for service of GE gas anesthesia machines.

9.     By virtue of the express and detailed findings in a verdict form entered in *Red Lion Medical Safety Inc. et al v. General Electric Company, Inc. et al.*, No. 2:15-cv-00308 (E.D. Tex.) (action brought by 14 ISOs), GE has been found to have monopolized service for a relevant market for service for GE gas anesthesia machines using parts and service training exclusionary practices. Ex. A attached (verdict form); Ex. B (jury instructions). The District Court has denied GE's post-trial motions seeking to set aside these findings as to unlawful monopolization. Memorandum and Order (Dkt. No. 247, filed March 30, 2018)**.** It has ordered a new trial as to the ISOs' lost-profit damages. (The latter vary from the class overcharge damages sought here, which are computed as the difference from the estimated pricing purchasers would have paid with competition and the monopoly price actually paid.).

10.    When this judgment as to violation is entered upon the conclusion of the retrial of damages, GE will be collaterally estopped from contesting here that it has violated the antitrust

laws by using its monopolies in the relevant markets for the sale of GE parts and GE service training to acquire and maintain a monopoly in a distinct and separate relevant market for the sale of service for GE gas anesthesia machines to the date of the judgment.

11.     As a consequence, direct purchasers of GE service in the proposed Class need only show this Court that they have been materially injured by GE service monopolization in their business or property by paying monopoly pricing to GE and the amount of their actual damages.

12.     Should this Court determine in some respect that collateral estoppel does not pertain as to monopolization, Plaintiffs would show the Court as follows.

## PARTIES

13.     Plaintiff RGOI ASC, LTD. d/b/a Rio Grande Orthopedic Institute Ambulatory Surgery Center is a Texas corporation primarily providing arthroscopic treatment of knee and shoulder injuries in McAllen, Texas. In its practice it employs GE gas anesthesia machines and has purchased GE service for those machines in the last four years.

14.     Plaintiff Monroe County Health Care Authority d/b/a Monroe County Hospital is an Alabama corporation providing health care services in Monroeville, Alabama. In its practice it employs GE gas anesthesia machines and has purchased GE service for those machines in the last four years.

15.     Defendant General Electric Company is a New York corporation with a principal place of business in Boston, Massachusetts.

16.     Defendant GE Healthcare Inc. is a subsidiary of General Electric Company incorporated in the state of Delaware with a principal place of business in Chicago, Illinois.

17.     Defendant Datex-Ohmeda, Inc. d/b/a GE Medical Systems is a subsidiary of General Electric Company incorporated in the state of Delaware with a principal place of business in Madison, Wisconsin.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1337 (commerce and antitrust regulation), Section 2 of the Sherman Act (15 U.S.C. § 2), and Sections 4(a) and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

19.     Venue is proper because GE is headquartered in this judicial district and thus resides herein as provided in 28 U.S.C. § 1391(b) and (c), and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

## TRADE AND COMMERCE AFFECTED

20.     Defendants are in the business of selling, among other things, the servicing of GE-manufactured gas anesthesia machines.

21.     At all times pertinent to this Complaint, Defendants have sold a substantial amount of servicing of GE-manufactured gas anesthesia machines in interstate commerce in numerous states around the United States.

22.     Defendant's conduct has affected a substantial amount of interstate trade and commerce in the United States with respect to the sale of servicing of GE manufactured gas anesthesia machines.

## RELEVANT MARKETS

### Relevant Product Market for the Sale of Parts
### for GE Anesthesia Gas Machines

23.     This market encompasses the sale of parts, service manuals, and other documentation (collectively "parts") necessary to service GE gas anesthesia machines. The

4

market includes the sellers of parts fully compatible with GE gas anesthesia machines to which ISOs and others can reasonably turn for alternative supplies to service these GE machines.

24.     Because the parts needed to service the GE machines are not reasonably interchangeable with those used with other brands of gas anesthesia machines, the relevant parts market is composed only of sales of parts for use in the GE machines.

25.     By virtue of the express and detailed findings by the jury in *Red Lion Medical Safety Inc.*, when judgment is entered GE will be collaterally estopped from contesting here that there exists a distinct parts relevant product market as defined. This jury heard and decided (1) identical market definition issues; (2) and this definition was necessary to its decision. Ex. A at 2 ¶ 1.2; Ex. B at 23 ¶¶ 1, 3.

**Relevant Product Market for the Sale of Service
Training for GE Gas Anesthesia Machines**

26.     This market encompasses the sale of training necessary for the service of GE gas anesthesia machines. The market includes the sellers to which GE and ISO technicians and others can reasonably turn for alternative supply of training necessary to service these GE machines.

27.     Because training for this service is not reasonably interchangeable with training used for service of other brands of gas anesthesia machines, the relevant service-training market is composed of sales of service training for the service of GE gas anesthesia machines only.

28.     By virtue of the express and detailed findings by the jury in *Red Lion Medical Safety Inc.*, when judgment is entered GE will be collaterally estopped from contesting here that there exists a distinct relevant market for GE service training as defined. This jury heard and decided (1) identical market definition issues; (2) and this definition was necessary to its decision. Ex. A at 2 ¶ 1.2; Ex. B at 23 ¶¶ 1,3.

### Relevant Product Market for Sale of Service
### for GE Gas Anesthesia Machines

29.     This market encompasses the sale of service for GE gas anesthesia machines. The market includes the sale by GE and ISOs providing service for these machines to which hospitals and other operators of these machines may reasonably turn for their service. The market does not include service that hospitals and other operators provide on their own machines because they do not compete with GE and ISO technicians to provide service to other operators. A large majority of operators do not employ in-house technicians servicing their GE machines.

30.     The fact that a hospital may service its own GE anesthesia machine does not act as a price constraint on external servicers such as GE and ISOs. A ten percent increase in price of an anesthesia servicing contract would not be sufficient for a hospital to integrate vertically that contract, suggesting that in-house technician service is not interchangeable with ISO, GE, or asset-manager service.

31.     Hospitals are the largest purchasers of service for GE anesthesia gas machines. Service is also purchased by out-patient surgery centers, individual physicians, and physician groups. Hospitals generally may own anywhere from two to twenty-five GE machines. An average-size hospital, one with approximately 400 beds, may own eight to ten machines.

32.     Gas anesthesia machines are very durable and, with proper servicing, can have a useful life of ten to fifteen years or more. They require regular service.

33.     To provide full, competitive service for all these GE machines GE and ISOs must have immediate access to a near-complete inventory of GE parts and employ trained technicians skilled in the service of this complex equipment. An ISO without reliable GE parts access is unable to respond adequately, rapidly, and reliably to many types of service problems. Its service customers require such response.

34.     Sales of service for GE gas anesthesia machines are in a relevant market distinct from the relevant markets for the sale of GE parts and GE service training. There is sufficient operator service demand such that it is efficient for GE to provide service separately from its sales of GE parts and GE service training. Some operators buy GE service without GE parts because some service does not require parts, and hospitals and other operators which maintain their GE machines buy parts and service training without service.

35.     The proper service market definition for GE gas anesthesia machines necessarily excludes technicians who are only capable of servicing non-GE brands.

36.     GE does not sell a complete system comprising the sale of the GE machine, lifetime service, and lifetime parts for a single price.

37.     By virtue of the express and detailed findings by the jury in *Red Lion Medical Safety Inc.*, when judgment is entered, GE will be collaterally estopped from contesting here the existence of a distinct and separate relevant market for service of GE anesthesia gas machines as defined. This jury heard and decided (1) identical market definition issues; (2) and this definition was necessary to its decision. Ex. A at 2 ¶ 1.2; Ex. B at 23 ¶¶ 1,3.

**Relevant Geographic Markets**

38.     Along with asset managers and numerous ISOs, GE services a national market. Customers can and do turn to providers nationwide for timely service, at least because ISOs and GE are able to provide service far from their home offices by stationing technicians around the country at minimal cost.

39.     Thus, the geographic relevant market for service of GE gas anesthesia machines is nationwide, as customers turn to a national market when seeking service, and both the ISOs and GE are able to provide those services nationwide.

40.    The relevant geographic markets for sales of GE parts and GE service training also encompass the United States.

41.    By virtue of the express and detailed findings by the jury in *Red Lion Medical Safety Inc.*, when judgment is entered GE will be collaterally estopped from contesting here the existence of these relevant geographic markets as defined. This jury heard and decided (1) identical market definition issues; (2) and this definition was necessary to its decision. Ex. A at 1 ¶ 1.1; Ex. B at 12-13.

## MONOPOLY POWER

### Relevant Market for the Sale of Service for GE Gas Anesthesia Machines

42.    There is direct and circumstantial evidence of GE monopoly power in the relevant market for service of GE gas anesthesia machines.

43.    There is direct evidence of GE's ability to control prices or exclude service competition by virtue of its control of two essential inputs for GE anesthesia-machine service -- GE parts and training. GE is the only source for GE parts, and alternative sources for parts are unreliable and insufficient to provide service. Training is necessary for competition in the market. GE directly controls access to training and that GE is the only source for training. Technicians can work on GE anesthesia machines only if they use GE parts and have been GE-trained.

44.    There is also circumstantial evidence as well that GE possesses monopoly power, that is, GE controls 70 percent of the service product market protected by high barriers to entry.

45.    Even though GE's service pricing is above-competitive levels due to its exclusionary practices, the customer's cost of switching anesthesia machines is high and the machine operators will tolerate some level of above-competitive pricing and price increases

before changing equipment brands to obtain better service pricing.

46.     By virtue of the express and detailed findings by the jury in *Red Lion Medical Safety Inc.*, when judgment is entered GE will be collaterally estopped from contesting here the existence of its monopoly power in the relevant market for the sale of service for GE anesthesia gas machines as defined. This jury heard and decided (1) identical monopoly power issues; (2) and this finding of monopoly power was necessary to its decision. Ex. A at 2 ¶ 2.1; Ex. B at 23 ¶¶ 4,5.

## Relevant Product Market for the Sale of Parts
## For GE Gas Anesthesia Machines

47.     GE also has monopoly power in each of the distinct relevant markets for (a) the sale of GE parts essential for the service of GE anesthesia gas machines; and (b) the sale of service training essential for the service of these machines.

48.     GE has the power to control prices or exclude competition in the parts relevant market. Through its manufacture of the parts, its exclusive dealing arrangements with its parts suppliers, and its agreements with self-maintaining machine operators (that they will not re-sell GE parts to ISOs). GE controls nearly 100% of the supply of GE parts in the relevant market with no readily available substitutes for GE parts for use with GE anesthesia gas machines.

49.     There are multiple barriers to entry in the GE parts relevant market facing actual or potential parts competitors, including substantial economies of scale and scope enjoyed only by GE; GE exclusive dealing arrangements with its parts suppliers; and GE patents on some GE parts. GE maintenance manuals, technical service bulletins, technical service procedures and other documentation are protected under the federal copyright laws and GE does not allow them to be reproduced.

50.     By virtue of the express and detailed findings by the jury in *Red Lion Medical*

*Safety Inc.*, when judgment is entered GE will be collaterally estopped from contesting here the existence of its monopoly power in the relevant market for the sale of parts for GE anesthesia gas machines as defined. This jury heard and decided (1) identical monopoly power issues; (2) and this finding of monopoly power was necessary to its decision. Ex. A at 2 ¶ 2.1; Ex. B at 23 ¶¶ 1,3,4,5.

**Relevant Product Market for the Sale of Service
Training for GE Gas Anesthesia Machines**

51.     GE has the power to control prices or exclude competition in the service-training relevant market. It controls nearly 100% of sales in this relevant market with no readily available substitutes for training on the full range of GE anesthesia machines.

52.     Barriers to entry face actual or potential GE service-training competitors. As the manufacturer and service provider for its gas anesthesia machines, GE enjoys substantial learning by doing not enjoyed by its actual or potential competitors which would be prohibitively costly for them to replicate. Further GE maintenance manuals, technical service bulletins, technical service procedures and other documentation cannot be reproduced without violating federal copyright law.

53.     By virtue of the express and detailed findings by the jury in *Red Lion Medical Safety Inc.*, when judgment is entered GE will be collaterally estopped from contesting here the existence of its monopoly power in the relevant market for the sale of service training for GE anesthesia gas machines as defined.  This jury heard and decided (1) identical monopoly power issues; (2) and a finding of monopoly power was necessary to its decision. Ex. A at 2 ¶ 2.1; Ex. B at 23 ¶¶ 1,3,4,5.

**Relevant Market for GE Service**

54.     GE has the power to control prices or exclude competition in the relevant market

10

for service of GE gas anesthesia machines. It has leveraged its monopoly control over the relevant markets for GE parts and GE service training to control price or exclude competition in the relevant market for service of GE gas anesthesia machines. It has acquired and maintained between 60% and 70% shares in this highly-concentrated market which are protected by high barriers to entry, including GE's control over GE parts and GE service training essential for the service of its machines.

55.     GE's nationwide and persistent exclusion of service competition has suppressed the presence and capacity of its ISO competitors nationwide such that they cannot take sufficient market share from GE to make its monopoly service pricing unprofitable and bid this pricing down to competitive levels.

56.     Nor does the loss of prospective machine sales by GE due to its aftermarket monopoly service pricing prevent GE's monopoly service pricing. Its machine purchasers are not able to engage in effective, accurate, and long-term "life cycle" pricing with which they are able to determine the total cost of operating a machine (including monopoly service and parts pricing) over its lifetime due to very substantial information costs. This lifetime may encompass ten to fifteen years a machine operates. GE does not sell for one price the cost of the machine, GE parts and GE service.

57.     Nor can machine operators reasonably switch to alternative brands of gas anesthesia machines once they purchase a GE machine to prevent the cost of GE monopoly service pricing. GE machines are durable and require a substantial financial investment of between $35,000 to $90,000. Thus, for the most part, it is not feasible for an operator to forgo much of this investment to switch to another brand in response to GE service monopoly pricing with the effect of disciplining and preventing this monopoly pricing.

58.     Further, direct evidence of GE monopoly power over the sale of GE service is its persistent ability to set its service pricing substantially above the service pricing of its ISO competitors for comparable service (where ISOs have been able to obtain the necessary parts and service training typically for older machines).

59.     By virtue of the express and detailed findings by the jury in *Red Lion Medical Safety Inc*., when judgment is entered GE will be collaterally estopped from contesting here the existence of its monopoly power in the relevant market for the sale of service for GE anesthesia gas machines as defined. This jury heard and decided (1) identical service monopoly power issues; (2) and a finding of this monopoly power was necessary to its decision. Ex. A at 2 ¶ 2.1; Ex. B at 23 ¶¶ 1,3,4,  5

**GE EXCLUSIONARY CONDUCT TO
MAINTAIN A SERVICE MONOPOLY**

**Collateral Estoppel**

60.     By virtue of the express findings by the jury in *Red Lion Medical Safety Inc*., when a violation judgment is entered, GE will be collaterally estopped from contesting here that it has used its monopolies over the relevant markets for GE parts and GE service training to acquire and maintain a monopoly over the relevant market for sale of service for its anesthesia gas machines. The jury heard and decided (1) identical monopoly violation issues presented here; (2) and a finding of this violation was necessary to its decision. Ex. A at 3 ¶¶ 2.2,2.3; Ex. B at 23 ¶¶ 4,5. In the alternative, should estoppel be found not to pertain, Plaintiffs would show the Court as follows.

**Long-Term GE Exclusionary Conduct Contributing to
Antitrust Price Injury in the Damage
Period Is Actionable**

61.     All GE exclusionary acts before and after the beginning of the four-year damage

period which materially contribute in combination to GE monopoly power, monopoly pricing in the relevant service market, and antitrust price injury in the damage period are all actionable. Much of GE's exclusionary conduct continues to the present and occurs in the damage period. Nonetheless, as a matter of law, exclusionary acts occurring before the beginning of the damage period in 2014 are also actionable to the extent they contribute to antitrust price injury in the damage period. As long as GE continues to use monopoly power it has gained unlawfully over time to overcharge purchasers of its service, it has no claim on the repose that a statute of limitations is intended to provide. The taint of anticompetitive origin does not dissipate after four years if the exclusionary conduct continues to cause antitrust price injury in the damage period.

### GE's Exclusionary Conduct Is Evaluated in Its Entirety Rather Than Piecemeal

62.     Plaintiffs need not demonstrate how each of GE's several exclusionary acts leveraging its parts and service-training monopolies have alone materially contributed to the acquisition and maintenance of its monopoly power in the relevant service market.  As a matter of law, the combined effect of GE's exclusionary practices must be evaluated to determine whether in combination they have materially contributed to monopoly power and above-competition pricing for its service. Each exclusionary act alone need not constitute monopolization of the relevant service market. Further, Plaintiffs need not demonstrate how much each exclusionary act alone has contributed to the level of GE monopoly pricing.

### GE's Use of Its Parts Monopoly to Monopolize Service

63.     While GE's exclusionary conduct must be viewed as a whole, each of its exclusionary practices even when viewed in isolation is anticompetitive.

64.     Timely access to GE parts is essential for ISOs to compete fully and vigorously

for service of GE gas anesthesia machines.  GE has used its monopoly power in the parts market to refuse to sell parts to ISOs, thus denying them access to inputs essential to compete in the service relevant market.

65.     This has severely disadvantaged its ISO competition. Timely and reliable ISO access to GE's parts is essential if ISOs are to be full and vigorous competitors for GE service technicians. ISOs' customers demand that they be able to obtain repair parts rapidly at reasonable cost to enable rapid and efficient repair of critical medical equipment.

66.     A monopolist in one market, here the GE parts relevant market, may not leverage its control over access to these parts to monopolize an adjacent market, here the service relevant market, by refusing to deal. Further, because GE has a history of selling parts profitably and directly to ISOs for nearly a decade and one half, it may not thereafter lawfully sacrifice those profits effectively to refuse to deal to gain a competitive advantage and obtain monopoly service profits.

### For a Decade and One-Half GE Profitably Sold Parts Directly to Its ISO Service Competitors, Allowing National ISO Service Competition.

67.     Between 1997 and 2011 Ohmeda/GE implemented a policy under which ISOs with technicians certified by Ohmeda/GE training schools could buy parts directly from Ohmeda/GE. (Ohmeda was purchased by GE in 2003). Thus for nearly a decade and one-half Ohmeda/GE made substantial profits from its direct sales to ISOs of parts.

### Beginning in 2011 GE Ended Its Direct Parts Sales with the Effect of Eliminating Reliable ISO Parts Access and Substantially Suppressing Service Competition.

68.     In 2011 GE began to refuse to sell parts directly to ISOs. It did so not because the sales had become unprofitable. It profitably continues to provide parts directly to (a) GE service technicians competing with the ISOs; and (b) hospitals and others maintaining their own

machines; including its government customers.

69.     In 2011 GE appointed an exclusive distributor for its parts, Alpha Source. Inc., and announced that ISOs could only buy its parts indirectly through this distributor. As opportunistically and anticompetitively implemented by GE and Alpha Source, this new distribution has inflicted seven competitive disadvantages on ISO service technicians substantially impeding their attempt to compete with unencumbered GE technicians.

70.     GE's appointment of Alpha Source was a scheme to stifle a competitive threat to GE's competitive position.   Prior to 2011 ISO were achieving double-digit growth. GE's appointment of a parts distributor to supply its competitors was in response to this threat. GE internally states that the Alpha Source appointment would "dis(enable)" competitors by slowing down competitor fulfillment capability and adding to their costs with the end result that ISO customers would return to GE. A GE executive found that the parts policy had this very effect.

71.     GE sacrificed profits in pursuing this parts policy. Internally it found that its reduced profits from the parts policy were "as hoped for the most part -- flat with decline."

72.     Not only did GE's appointment of Alpha Source "disenable" competitors by slowing down their fulfillment capabilities and increasing their costs, GE also admits that the parts policy harms customers, and that it has sacrificed short-term profits on the sale of parts for an anticompetitive reason. Internally it confirmed it had "hoped for" and achieved reduced profits on the sale of its GE parts as a result of the parts policy.

73.     An ISO's ability to pick up stray parts in some unreliable manner, or to acquire parts for older machines, does not translate to fully-vigorous and viable competition in the market for service of GE gas anesthesia machines.

**GE's Use of Its Service-Training
Monopoly to Monopolize Service**

15

74.     Three years after it began its exclusionary parts monopoly placing ISO technicians at a severe competitive disadvantage, GE dropped the other exclusionary shoe. It began using its monopoly over service-training to the same end, thereby increasing the potency of its service exclusion.

75.     By virtue of its monopoly in the relevant market for service-training GE has control over access to unique GE knowledge and knowhow as to the operation and service of its machines. GE has leveraged its training monopoly to exclude ISOs from the relevant service market.

76.     ISOs must have this training if they are to compete to provide a full range of service on both older and newer GE machines; and ISOs have in the past compensated GE adequately and profitably for such training when available.   GE has denied the ISOs this essential input they need to compete.

**For Years GE Profitably Sold Service Training to Its ISO Competitors.**

77.     Except for a period of four months in late 2006 and early 2007 (when GE implemented – and then rolled back – prohibitive, discriminatory price increases for ISO training) Ohmeda/GE between 1997 and 2014 dealt profitably with ISOs to provide their technicians service training comparable to that provided to its own technicians.

**Denial of ISO Training.**

78.     GE closed its training facility in 2013 and did not train ISOs for nearly a year, Then, reversing its profitable course of dealing with ISOs as to training on all GE machines, GE informed them that only the Jupiter, Florida GE training facility, which largely provides training only on GE's older machines, would be open for ISO enrollment.

79.     Nonetheless, it has effectively denied ISO access here as well. It takes the

16

position that at Jupiter "scheduling, frequency, and location of courses will remain at GE Healthcare discretion" and has used this discretion to curtail sharply, or eliminate for periods of time, effective ISO training access.

80.     Frequently ISOs have been told that Jupiter-scheduled courses of interest have been canceled or overbooked and, hence, unavailable.

81.     GE also effectively denies training access for its newer, more technically-sophisticated GE machines. ISOs have made repeated requests to attend the relevant training schools for three newer GE machines (the Aespire, the Avance, and the Aisys). They have been denied this access for the most part because this training is largely done at GE's Waukesha, Wisconsin location which has been made off limits for ISO training.

## GE Conditions Make ISO Training Economically Infeasible.

82.     GE also imposes training conditions further placing an ISO at a substantial competitive disadvantage. It compels an ISO to disclose to GE its service customers using the machines for which training is sought. Thus, GE is effectively demanding highly-confidential and sensitive customer lists as a condition of ISO training.

83.     Further, GE demands a verification from an ISO's customer which has the effect, in many instances, of preventing training access. For each training class desired by an ISO it has to present a customer certification to the effect: "[y]our signature below verifies that the ISO individual seeking to register for a GE Healthcare clinical systems technical training class performs services on GE Healthcare equipment that is the subject of the requested class and does so **exclusively at your site/network of sites**." (emphasis in the original).  Since the ISO customer often is aware that the technician will work on similar machines for other customers, it cannot provide in good faith the certification and this condition often prevents access. No similar

certification is required from a GE technician's customer to obtain comparable training. The customer endorsement policy was one final step in GE's scheme to "phase-out" third party training.

84.    Further, the requested verification also apparently disallows remote diagnosis and service by the ISO technician, whereas the competing GE technician can provide this service, which often allows more efficient and rapid diagnosis and service.   The earlier the GE technician's diagnosis the earlier the necessary parts and software can be acquired from GE, thereby deepening the ISO's competitive problem of lack of reliable parts access.

85.    In pursuit of its exclusionary training policies GE has sacrificed profits. It typically earns a 70% profit margin on training sales to ISOs, and that numerous ISO have applied for training and were rejected. GE admits that it was "giving up the money it could be making by training as many third parties as it ... possibly could[.]"

## INJURY TO COMPETITION

86.    Before GE's implementation of its exclusionary parts and service training policies ISOs, the low-cost providers in the market, were growing by double-digits. Thereafter they were severely hampered competitively by the GE policies, and the ISOs exclusion from the market has harmed competition.

87.    As a consequence of GE's exclusionary parts and service training policies, its ISO competitors have been prevented from obtaining a sufficient presence and capacity in the national service market to enable them to bid down GE's monopoly service pricing charged to its service customers in the proposed Class to competitive levels by taking service market share from GE sufficient to make its pricing unprofitable.

88.    The harm to competition due to GE parts and service training policies hurts its

own service customers. The GE policies have led to antitrust price injury inflicted on these customers by raising and maintaining prices to above-competitive levels, causing deterioration in service quality, and limiting customer choice as to service.

## CLASS ACTION ALLEGATIONS

### Class of Direct Purchasers of GE Service

### Federal Rule of Civil Procedure 23(a) Prerequisites

89.     Plaintiffs ("Class Representatives") are representatives of a Class of United States direct purchasers from GE of service for GE anesthesia gas machines on or after December 21, 2014 to the entry of judgment in *Red Lion Medical Safety Inc. et al v. General Electric Company, Inc. et al.*, No. 2:15-cv-00308 (E.D. Tex..) "Purchasers" include without limitation hospitals, hospital systems, clinics, physician groups, and asset management companies.

90.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is in the thousands and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact which are common to the members of the Class. These include, but are not limited to, common issues as to (1) the existence of collateral estoppel; (2) whether there has been service monopolization; (3) the existence of distinct and separate GE parts, GE service-training, and service relevant markets; and (4) whether GE's monopolization has caused antitrust price injury to be inflicted on purchasers of GE service

in the Class. In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the members of the Class.

91.     The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action and monopoly service pricing.

92.     The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representatives and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representatives and the other members of the Class.

### Federal Rule of Civil Procedure 23(b)(3) Prerequisites

93.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Federal Rule of Civil Procedure 23(b)(2) Prerequisites

94.     The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because GE has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## COUNT I

**Monopolization**
**(Section 2 of the Sherman Act)**

95.     All foregoing paragraphs incorporated herein by reference.

96.     GE has monopolized the relevant market for sale of service for GE gas anesthesia machines as alleged.

97.     It has used its monopolies over the relevant market for sale of parts for GE gas anesthesia machines and for the sale of service training for these machines to acquire and maintain monopoly power and monopoly pricing in the relevant service market.

98.     GE's exclusionary conduct has been a material cause of substantial price injury and actual damages to members of the proposed Class of direct purchasers of GE service and has denied them competitive choice.

99.     GE's conduct is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and as members of the proposed Class alleged pray that:

A.     This Court declare that Defendants' conduct constitutes a violation of the Sherman Act, 15 U.S.C. § 2 allowing treble damage relief to members of the proposed Class.

B.     This Court permanently enjoin Defendants from continuing the practices which in combinations are found unlawful under Section 16 of the Clayton Act, 15 U.S.C. § 26.

C.     Plaintiffs recover reasonable attorneys' fees and costs as allowed by law;

D.     Plaintiffs recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

21

E.      Plaintiffs be granted such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs request a trial by jury in this matter.

DATED: April 11, 2019                    Respectfully submitted,

                                         By:     */s/ Patrick J. Sheehan*
                                         Patrick J. Sheehan (BBO #639320)
                                         WHATLEY KALLAS, LLP
                                         60 State Street, 7th Floor
                                         Boston, MA 02109
                                         Telephone: (617) 573-5118
                                         Facsimile: (617) 371-2950
                                         Email: psheehan@whatleykallas.com

                                         Joe R. Whatley, Jr.
                                         Edith M. Kallas
                                         WHATLEY KALLAS LLP
                                         1180 Avenue of the Americas,
                                         20th Floor
                                         New York, NY 10036
                                         Telephone: (212) 447-7060
                                         Facsimile: (800) 922-4851
                                         Email: jwhatley@whatleykallas.com
                                                ekallas@whatleykallas.com

                                         Henry C. Quillen
                                         WHATLEY KALLAS, LLP
                                         159 Middle Street
                                         Suite 2C
                                         Portsmouth, NH 03801
                                         Telephone: (603) 294-1591
                                         Facsimile: (800) 922-4851
                                         Email: hquillen@whatleykallas.com

R. Stephen Berry
BERRY LAW, PLLC
1717 Pennsylvania Avenue, NW
Suite 852
Washington, DC 2006
Telephone: (202) 296-3020
Facsimile: (202) 296-3038
Email: sberry@berrylawpllc.com

Gregory S. Asciolla
Jay L. Himes
Karin E. Garvey
LABATON SUCHAROW, LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: gasicolla@labaton.com
       jhimes@labaton.com
       kgarvey@labaton.com

Mark A. Weitz
Kristi Morgan Aronica
WEITZ MORGAN PLLC
100 Congress Avenue, Suite 2000
Austin, TX 78701
Telephone: (512) 370-5211
Email: mweitz@weitzmorgan.com

Daniel R. Sonneborn (BBO #679229)
Eric G. Penley (BBO #678920)
PRETI FLAHERTY BELIEVEAU & PACHIOS, LLP
60 State Street
Suite 100
Boston, MA 02109
Telephone: (617) 226-3800
Facsimile: (617) 226-3801
Email: dsonneborn@preti.com
       epenley@preti.com

Charles F. Barrett
Benjamin C. Aaron
NEAL & HARWELL, PLC
1201 Demonbreum Street
Suite 1000
Nashville, TN 37203
Telephone: (615) 244-1713
Facsimile: (615) 726-0573
Email: cbarrett@nealharwell.com
       baaron@nealharwell.com

Robert C. King
THE KING LAW FIRM, P.C.
36 W. Claiborne Street
Monroeville, AL 36460
Telephone: (251) 575-3434
Facsimile: (251) 575-3003
Email: rcking@fronteirnet.net

Steven A. Martino
TAYLOR MARTINO, P.C.
51 Saint Joseph Street
Mobile, AL 36602
Telephone: (251) 433-3131
Facsimile: (251) 405-5080
Email: SteveMartino@taylormartino.com

*Attorneys for Plaintiffs*